ALAN WOOD STEEL COMPANY, Plaintiff-Appellant, *v.* CAPITAL EQUIPMENT ENTERPRISES, INC., Defendant-Appellee.

First District (1st Division) No. 60700

Opinion filed May 24, 1976.

James W. Collins, of Chicago (Boodell, Sears, Sugrue, Giambalvo & Crowley, of counsel), for appellant.

Harry Shriman, of Chicago (Shriman & Feldman, of counsel), for appellee.

Mr. JUSTICE BURKE delivered the opinion of the court:

Plaintiff brought an action in February, 1969, to recover the purchase price of a used industrial crane alleging that the crane did not conform to an express warranty given by defendant. The court granted defendant's motion for a finding at the close of plaintiff's case. (Ill. Rev. Stat. 1971, ch. 110, par. 64(5).) Plaintiff contends on appeal that the evidence establishes the creation and breach by the defendant of an express warranty attesting to the used crane's lifting capacity. Defendant responds that the contract between the parties does not include an express warranty.

On September 29, 1965, Alan Wood Steel Company ("Alan Wood"), located in Conshohocken, Pennsylvania, mailed inquiries to six used-equipment companies requesting price and delivery information about two different types of cranes: a 75-ton used diesel electric locomotive crane with a 70-foot boom and a 100-ton used diesel electric locomotive crane with a 70-foot boom. The record indicates that Alan Wood is a manufacturer of steel plates and strip, and presently uses locomotive cranes in its coke and chemical divisions. One of Alan Wood's inquiries was received by Capital Equipment Enterprises, Inc. ("Capital"), located in Bloomfield, New Jersey. Capital acts either as a broker or as a principal in its regular commercial practice of buying and selling working machinery, material handling equipment, and power generating equipment.

Homer Gottshall, assistant purchasing agent for Alan Wood, testified that he received a telephone call in January, 1966, from Murray Grainger, the president of Capital. Grainger informed Gottshall that a 75-ton steam locomotive crane with a 40-foot boom was available in Chicago for inspection and purchase. Grainger had never seen the crane which was then owned by Power Systems, Inc., of Chicago. Subsequently, Grainger and Gottshall made the necessary arrangements for an inspection of the crane in Chicago by George Boyd, Alan Wood's supervisor of heavy equipment.

Boyd's duties at Alan Wood included the supervision of the repair of locomotives and cranes owned by Alan Wood. Boyd did not testify at trial. However, both parties stipulated that if Boyd testified, he would

have stated that his inspection was limited to a determination of whether the crane's mechanical moving parts functioned properly. Boyd would have further testified that the crane was not tested for its lifting capacity. No representative from Capital was present at the time of Boyd's examination.

On February 3, 1969, Alan Wood received a "formal quotation" from Capital describing the crane as a "75 ton, 40 foot boom Brownhoist Steam Locomotive Crane." Boiler and speed specifications were listed, as well as the crane's manufacturing date, 1942, and its serial number, 11494. The asking price was $9950. The only printed terms on the quotation form are conspicuously located in the top center portion of the form's front side. The language reads as follows:

"CONDITIONS: All quotations are for immediate acceptance. They are subject to withdrawal, change, and prior sale without notice. Shipping dates are only approximate and contingent upon delays beyond our control. All equipment is subject to inspection and the descriptions are approximate and intended to serve as a guide. All orders received are binding only when they have been accepted and acknowledged by us in writing. Provisions in customer's purchase orders contrary to these conditions are not binding upon us unless accepted in writing. Prices quoted are F.O.B. shipping point, exclusive of state, county, and federal taxes, which must be added where applicable."

A few days after Alan Wood received Capital's "formal quotation," Homer Gottshall and Murray Grainger again conversed by telephone. Gottshall requested that a second inspection by one of Alan Wood's representatives be arranged. Lester Seifert, a crane operator employed by Alan Wood, inspected the crane in Chicago in February, 1966.

Seifert's duties at Alan Wood included operating and repairing the various cranes owned by Alan Wood. Seifert did not testify at trial. However, both parties stipulated that if Seifert testified, he would have stated that his inspection consisted of observing the crane in operation. The crane was moved along a railroad track, and its boom was maneuvered in every feasible direction. However, the crane was never tested for its lifting capability. No representative from Capital was present at the time of Seifert's examination.

The management of Alan Wood, after conferring with Seifert upon his return, instructed Gottshall to purchase the crane. Gottshall informed Grainger by telephone on February 16, 1966, that Alan Wood was willing to accept Capital's offer of sale, and that a purchase order would be mailed to Capital. Gottshall testified on cross-examination that he did not speak with either Boyd or Seifert about their respective examinations of the crane. Gottshall further stated that Grainger informed him that the

crane was an Industrial Brownhoist during their first telephone conversation in January, 1966. The record indicates that Alan Wood owns, operates and is familiar with other heavy equipment manufactured by Industrial Brownhoist.

On February 21, 1966, Alan Wood mailed a form purchase order and an accompanying form acknowledgment to Capital. The reverse side of these documents identically contained 17 printed terms and conditions which were to be accepted by Capital upon the signing and return of the acknowledgment. Included among the more pertinent terms were the following: seller would warrant conformity to all specifications furnished by purchaser; seller would warrant that all materials would be free from defect for a period of one year; time of performance would be of the essence; shipment would be in seller's name; and certain provisions of the Fair Labor Standards Act would be applicable. Alan Wood tendered $5000 to Capital as partial payment for the crane.

On February 23, 1966, Murray Grainger returned Alan Wood's acknowledgment. Below his signature on the face of the acknowledgment, Grainger typed, "Accepted subject to modifications contained in our letter dated 2/23/66 attached." Grainger's letter addressed to Homer Gottshall reads as follows:

"We acknowledge with thanks receipt of your order #G-5861 and your deposit which we are pleased to accept subject to the following modifications discussed by telephone:

1. The provision on the face of the order in regard to compliance with the Fair Labor Standards Act shall not apply.

2. Shipment papers will show your company as the shipper.

3. The delivery date is not to be considered as a commitment and in all likelihood the crane should arrive at your plant several weeks afterward.

4. The crane is offered and sold without warranties either express or implied, and in effect sold as inspected before shipment.

The crane itself is already prepared for shipment and the car which has been ordered for the boom should be in shortly. All that remains to be done is to put the boom on the car and obtain the acceptance by the railway inspector. As soon as this is accomplished we will notify you and bills of lading will be sent showing the car number, routing, etc."

The returned acknowledgment and Grainger's letter were stamped by Alan Wood as being received on February 24, 1966. On cross-examination at trial, Gottshall testified that he did not remember the telephone conversation between himself and Grainger mentioned in the above letter. Moreover, Gottshall stated that he did not remember seeing the letter until August or September of 1966. On February 26, 1966, Capital

purchased the crane from its former owner, Power Systems, Inc. On May 3, 1966, the crane arrived at the Alan Wood plant much later than the originally designated delivery date. Alan Wood paid the remaining balance of the purchase price and all shipping costs. Shipment papers reveal that Alan Wood was named as the shipper.

Four months following receipt of the crane (on August 24, 1966), Alan Wood notified Capital that the crane would lift only 15 tons. Capital reported the problem to Power Systems and requested its advice. Alan Wood later received information from Power Systems explaining that the crane was designed to lift heavy loads with the crane's out-riggers fully extended.

On September 20, 1966, Alan Wood advised Capital that representatives from Industrial Brownhoist had supplied them with data pertaining to the crane's operational capabilities. Alan Wood related that the maximum lifting capacity of the crane was 50 tons with the 40-foot boom fully elevated at a 16-foot radius. Blueprints introduced into evidence indicate that the crane, when manufactured in 1942, was originally equipped with a curved 30-foot boom, different in kind than the straight 40-foot boom presently attached to the crane. When manufactured in 1942, the crane equipped with its original 30-foot boom had a lifting capacity of 75 tons. The record does not reveal any circumstance explaining how or by whom the 30-foot curved boom was replaced with the 40-foot straight boom. However, it is undisputed that the crane is capable of lifting objects at a radius of 16 feet. Moreover, there is no evidence in the record explaining why the straight boom reduces the crane's lifting capacity.

A photograph of the crane introduced into evidence shows that a rating plaque, bolted to the side of the crane's cab, is conspicuously visible. The ratings on the plaque indicate that the maximum lifting capacity is 150,000 pounds at a 16-foot radius. However, the rating plaque also indicates that the maximum radius, or length, which the boom can be flatly extended is 30 feet, not 40 feet. The rating plaque further indicates that lifting capacity is least when the crane's boom is flatly extended at 30 feet.

Alan Wood subsequently demanded that Capital refund the purchase price and accept return of the crane. In March, 1967, Capital instituted an action against Power Systems alleging that the crane did not conform to the lifting capacity represented. The record indicates that the action was settled between Capital and Power Systems, although the terms of the settlement are not before us. At trial in the present action, Alan Wood attempted to introduce into evidence Capital's complaint, Power Systems' answer, and responses given by Murray Grainger of Capital to written interrogatories submitted by Power Systems. The trial court refused to admit into evidence the entire file containing these documents.

As an additional issue on appeal, Alan Wood contends that these documents should have been introduced into evidence.

The first issue before us is whether the contract between the parties contains an express warranty that the crane was capable of lifting 75 tons at the time of sale. Alan Wood argues that the descriptive language "75 ton crane" typed on the quotation form prepared by Capital creates an express warranty by description. Alan Wood relies on section 2-313 of the Uniform Commercial Code ("Code") which provides:

"(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Ill. Rev. Stat. 1965, ch. 26, par. 2—313.

Express warranties rest upon "dickered" terms of the individual bargain and are therefore contractual in nature. (Ill. Ann. Stat., ch. 26, §2—313, Uniform Commercial Code Comments 1 and 4 (Smith-Hurd 1963).) The Code employs the "basis of the bargain" concept to determine whether descriptions or affirmations are to be given legal effect as warranties. The "basis of the bargain" test focuses upon the descriptions or affirmations which clearly go to the essence, or the basic assumption, of the bargain between the parties. Section 1—201(3) of the Code equates the term "bargain" with the term "agreement" in the following definition:

"(3) 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1—205 and 2—208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1—103)." Ill. Rev. Stat. 1965, ch. 26, par. 1—201(3).

■■ As implemented by the Code in all of its provisions, the terms

"bargain" and "agreement" are intended to include full recognition of several pertinent elements relating to the parties' dealings. (Ill. Ann. Stat., ch. 26, §1—201, Uniform Commercial Code Comment 3 (Smith-Hurd 1963).) This definitional framework is important to our inquiry as to whether the terms of the parties' contract give rise to an express warranty. In accord is pre-Code case law which holds that the existence of an express warranty is to be determined by examining the intent of the parties as expressed by the language of their contract, when read in light of surrounding circumstances. (*MacAndrews & Forbes Co. v. Mechanical Manufacturing Co.*, 367 Ill. 288, 11 N.E.2d 382, *cert. denied*, 303 U.S. 655.) Prevailing case law under the Code holds that the existence of an express warranty in an agreement not involving an integrated contract is a question of fact to be determined by the trier of fact. (Ill. Ann. Stat., ch. 26, §2—313, Uniform Commercial Code Comment 3 and Illinois Comment (Smith-Hurd 1963); *Capital Equipment Enterprises, Inc. v. North Pier Terminal Co.*, 117 Ill. App. 2d 264, 254 N.E.2d 542; *Janssen v. Hook*, 1 Ill. App. 3d 318, 272 N.E.2d 385.) It is well established that the findings of the trial court will not be disturbed on review unless those findings are manifestly against the weight of the evidence. Accordingly, we examine the commercial relationship between Alan Wood and Capital in its entirely.

At the outset of the parties' negotiations it was understood by Alan Wood that an initial inspection was necessary because Murray Grainger of Capital had not seen the crane which was located in Chicago. Moreover, Alan Wood deemed it necessary to conduct a second inspection after it had received the terms of Capital's offer of sale. The parties conducted themselves during the negotiation period with the knowledge that the risks inherent to the purchase of a 1942 used crane, which the seller had not examined, necessarily remained with the buyer.

In order to determine the terms of the contract between Alan Wood and Capital, we turn to section 2—207 of the Code. The purpose of section 2—207 is to eliminate the confusion caused by the exchange of different business forms which contain conflicting terms. Section 2—207 provides:

> "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." Ill. Rev. Stat. 1965, ch. 26, par. 2—207.

■■ The general policy of section 2—207 is that the parties should be able to enforce their agreement, whatever it may be, despite discrepancies which may exist between an oral agreement and a written confirmation, and despite discrepancies between a written offer and a written acceptance, if the acceptance can be granted without requiring either party to be bound to a material term to which it has not agreed. (*American Parts Co. v. American Arbitration Association* (1967), 8 Mich. App. 156, 154 N.W.2d 5.) The drafters of the Code intended to preserve an agreement, as it was originally conceived by the parties, in the face of additional material terms included in standard forms exchanged by merchants in the normal course of dealings. The common law requirement of "mirror image" terms in the offer and acceptance has been rejected by the Code because modern business practices have altered the method by which an offer is extended and accepted. (See 1 Williston On Sales §7—5 (4th ed. 1973). However, section 2—207(2) permits the offeror to retain control of the offer, as the common law provided, and allows the offeror a power equivalent to the offeree's power to expressly condition his acceptance.

Capital's "formal quotation" form submitted to Alan Wood constituted an offer of sale. As master of its offer, Capital strictly limited acceptance to the terms of the offer, as permitted by subsection 2—207(2)(a). The terms of the offer were contained in the only printed language on the form located in the top center portion of the front side. The terms are printed on the quotation form in such a position as to invite attention. It is reasonable to say that Alan Wood ought to have noticed the terms in Capital's offer. According to the Code, the terms of the offer are "conspicuous" by definition. Ill. Rev. Stat. 1965, ch. 26, par. 1—201(10); Ill. Ann. Stat., ch. 26, §1—201(10), Illinois Comment 10 (Smith-Hurd 1963); *Willis v. West Kentucky Feeder Pig Co.*, 132 Ill. App. 2d 266, 265 N.E.2d 899.

The language contained in Capital's offer expressly provides that

contrary terms contained in the customer's purchase order would not be binding unless accepted by Capital in writing; that all orders received by Capital were not binding unless accepted by Capital in a written acknowledgment; that all descriptions contained in the quotation were approximate and served only as a guide; and that shipping dates were approximate and contingent on delays beyond the control of Capital. Homer Gottshall of Alan Wood orally accepted the offer by telephone before mailing Alan Wood's purchase order to Capital. Terms included in Alan Wood's purchase order were directly contrary to the terms contained in Capital's offer. On the day Murray Grainger of Capital received Alan Wood's purchase order and acknowledgment form, he returned by mail the acknowledgment form with a written confirmation attached. On the face of Alan Wood's signed acknowledgment, Grainger typed, "Accepted subject to modifications contained in our letter dated 2/23/66 attached." Grainger's letter verifies an oral agreement between himself and Homer Gottshall of Alan Wood made by telephone on February 23, 1966. Among the terms agreed upon by the parties was that the crane was sold as inspected without warranties. Subsection 2—207(2)(c) of the Code provides that an offeror may reject terms in the offeree's acceptance form by promptly notifying the offeree that the terms of the original offer are to control. Capital's confirmation of February 23, 1966, evidences Alan Wood's consent to Capital's insistence that the contract contain terms consistent with those in the original offer. The record reveals facts which reflect Alan Wood's compliance with the terms of the confirmation. Alan Wood was named shipper of the crane without objection and Alan Wood accepted late delivery of the crane without objection. Both conditions relating to shipping and delivery are contained in Capital's confirmation. Pursuant to section 2—207(2) of the Code, all of the terms in Capital's confirmation, including the disclaimer, became part of a binding contract between Capital and Alan Wood. The deal was closed with the parties' oral agreement on February 23, 1966, which was verified by Capital's written confirmation of the same date.

■■ As we have previously noted, section 2—313 of the Code gives warranty effect to a seller's descriptions or affirmations if they are "part of the basis of the bargain." Generally, disclaimers of affirmations or descriptions found to be express warranties are invalid if the disclaimer is inconsistent with the terms of the parties' agreement. (See White & Summer, Uniform Commerical Code §12—3 (1st ed. 1972).) Alan Wood argues that section 2—316(1) of the Code, which protects buyers from unexpected and unbargained disclaimer language, invalidates the disclaimer. Section 2—316(1) provides:

"(1) Words or conduct relevant to the creation of an express

warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of his Article on parol or extrinsic evidence (Section 2—202) negation or limitation is inoperative to the extent that such construction is unreasonable." Ill. Rev. Stat. 1965, ch. 26, par. 2—316.

One of the terms found in Capital's offer reads:

"All equipment is subject to inspection and descriptions are approximate and intended to serve as a guide * * *."

This language indicated to Alan Wood that the description of the crane as a "75-ton Brownhoist" did not give rise to an express warranty. The circumstances surrounding the parties' bargain corroborates our conclusion. The record does not indicate that Capital gave any written or oral affirmative representations that the crane would lift 75 tons. Indeed, since Murray Grainger of Capital had never seen the crane, it would have been folly to do so. The understanding between the parties clearly rested on the premises that a used crane was available; that the seller could not warrant its kind or quality; and that the buyer assumed all risks in its purchase. The record reveals that Alan Wood's decision to purchase the crane was primarily based upon the opinions and observations of their skilled inspectors who examined the crane on two different occasions. The Code apparently intends that the buyer need not place "particular reliance" on seller's affirmations in order for those affirmations to be considered part of the basis of the bargain. (Ill. Ann. Stat., ch. 26, §2—313, Uniform Commercial Code Comment 3 (Smith-Hurd 1963).) However, significant reliance by the buyer on his examination of the product before the deal is completed has been held by prevailing case law to indicate that buyer's lack of reliance on seller's affirmations or descriptions precluded the creation of an express warranty. (*Janssen v. Hook*, 1 Ill. App. 3d 318, 272 N.E.2d 385; *Sylvia Coal Co. v. Mercury Coal & Coke Co.* (1967), 151 W. Va. 818, 156 S.E.2d 1; accord, *Capital Equipment Enterprises, Inc. v. North Pier Terminal Co.*, 117 Ill. App. 2d 264, 254 N.E.2d 542; see White & Summers, Uniform Commercial Code §9—4 (1st ed. 1972).) In this instance, we only find that the circumstances surrounding the arrangement of both inspections and Alan Wood's subsequent reliance on its experts' opinions further illustrates that Capital's description of the used crane was not included as part of the basis of the bargain.[1]

---

[1] We must note that the rating plaque on the side of the crane's cab indicated that the crane's maximum radius was 30 feet, which meant that a 30-foot boom should have been attached to the crane. It should have been apparent to Alan Wood's skilled inspectors that a discrepancy existed between the radius specification listed on the rating plaque and the 40-foot boom presently attached to the crane. Compare *Standard Stevedoring Co. v. Jaffe* (1956), 42 Tenn App. 378, 302 S.W.2d 829.

In light of the language in Capital's offer and the circumstances surrounding the deal, the disclaimer contained in Capital's confirmation is simply another indication that the parties intended the crane to be sold as inspected without warranties. Capital's confirmation reflects that the disclaimer term was specifically agreed upon by the parties to be part of the contract. The disclaimer was not an unexpected or unbargained term. We are not confronted with a situation where an express warranty is created in one breath and surreptitiously disclaimed in another. We conclude that no express warranty was included in the terms of the contract; no express warranty was created by the identification language "75-ton Brownhoist" in the context of the parties' agreement; and, therefore, no express warranty was "part of the basis of the bargain." The disclaimer language is consistent with the other terms of the parties' bargain and is not invalid under section 2—316(1) of the Code. *First National Bank v. Husted*, 57 Ill. App. 2d 227, 205 N.E.2d 780; *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc.* (6th Cir. 1975), 509 F.2d 1043; 3 Williston On Sales §20—4 (4th ed. 1974); Ill. Ann. Stat., ch. 26, §2—313, Uniform Commercial Code Comment 4 (Smith-Hurd 1963); Ill. Ann. Stat, ch. 26, §2—316, Uniform Commercial Code Comment 1 (Smith-Hurd 1963).

■■ In sum, we must give effect to the terms of the contract as formed by the parties. (Ill. Rev. Stat. 1965, ch. 26, par. 1—102.) Alan Wood's expectations cannot be extended beyond the terms and nature of the parties' agreement. The trial court's ruling was not against the manifest weight of the evidence. *Hawthorn Mellody Farms Dairy, Inc. v. Rosenberg*, 11 Ill. App. 3d 739, 743, 744, 297 N.E.2d 649, 652, 653.[2]

■■ As a second issue on appeal, Alan Wood contends that all the documents pertaining to an action instituted by Capital against Power Systems in March, 1967, should have been allowed into evidence. The trial court closely reviewed Capital's complaint, Power Systems' answer, and the answers given by Murray Grainger of Capital to written interrogatories submitted by Power Systems. A pleading in another cause of action containing an admission is properly admissible against the pleader who is a party in other litigation. (*Carlson v. New York Life Insurance Co.*, 76 Ill. App. 2d 187, 222 N.E.2d 363; McCormick On Evidence §265 (2d ed. 1972).) At trial, however, Alan Wood failed to identify which specific pleadings constituted an admission relating to an issue in the present action. The trial court noted that it was improper to introduce the entire file into evidence and that no specific admission against Capital pertaining to the issues presented in the instant action

[2] The agreed purchase price for the 1942 crane in question was $9950. Plaintiff stated during oral argument that a new crane capable of lifting 75 tons could have a purchase price of over $100,000. The purchase price is one aid in determining whether the seller's descriptions or affirmations are to be considered as part of the basis of the bargain, and therefore be given warranty effect. 3 Williston On Sales §17—5 (4th ed. 1974).

could be found. After examining the record, we agree with the trial court and conclude that it did not abuse its discretion in refusing to admit into evidence the documents offered by Alan Wood.

For these reasons the judgment is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and SIMON, J., concur.