Karen BENTLEY, Plaintiff,

v.

Charles SLAVIK and Rosemary Slavik, Defendants.

No. 86–3373.

United States District Court,
S.D. Illinois.

June 24, 1987.

Don Cary Collins, Belleville, Ill., for plaintiff.

Melissa Chapman, Granite City, Ill., for defendants.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

This cause was tried before the Court, without a jury, on May 26 and 27, 1987. Having heard and considered the evidence and arguments of all parties, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Fed.R.Civ.P.

## FINDINGS OF FACT

Plaintiff, Karen Bentley, is a citizen of the State of Indiana. Defendants, Charles Slavik and Rosemary Slavik, are citizens of the State of Illinois, who reside within the Southern District of Illinois.

During January, 1984, plaintiff observed, on a bulletin board located at Indiana University, a notice which the defendant, Charles Slavik, asked to be placed there. In the notice, Slavik represented that he had for sale an Auguste Sebastien Philippe Bernardel violin made in 1835 with an appraised value ranging from $15,000 to $20,000.

In response to the notice, plaintiff contacted Slavik by telephone to inquire about the violin. During the telephone conversation, Slavik again represented that he had an authentic 1835 Bernardel violin with an appraised value ranging from $15,000 to $20,000, and invited the plaintiff to visit the defendants at their home in Edwardsville, Illinois, to see the violin.

On January 28, 1984, plaintiff travelled to defendants' home, saw the violin, played and inspected it for at least two hours. During the plaintiff's visit, Charles Slavik again represented to the plaintiff that the violin was an authentic 1835 Auguste Sebastien Philippe Bernardel violin, and further showed her Certificate No. 5500 from one Robert Bernard Tipple dated September 21, 1980, which certificate estimated that the violin was an authentic Auguste Sebastien Philippe Bernardel violin, which had a value of $15,000 to $20,000. Tipple, since deceased, was a violin maker, authen-

ticator, and appraiser in Mount Vernon, Illinois.

In reliance upon the representations of Slavik, and the certificate presented by him, plaintiff purchased the violin from defendant, Charles Slavik, for $17,500. At that time, plaintiff paid Charles Slavik $15,-000 by check, and agreed to pay the balance of $2,500 by February 15, 1984. The bill of sale signed by Slavik referred to the sale of "One Bernardel A.S.P. Violin." The second payment was made by check dated February 13, 1984, mailed from Indiana. A letter which accompanied the $2,500 check expressed the plaintiff's pleasure with the violin. From the date of purchase until the end of 1985, the plaintiff played the violin for an average of eight hours a day.

Sometime in April of 1985, plaintiff became aware that the violin might not be a genuine work of Auguste Sebastien Philippe Bernardel made in 1835. Shortly after the plaintiff became aware the violin might not be a genuine Bernardel, plaintiff made demand upon Charles Slavik to return the purchase price and offered to return the violin, but Slavik refused to do so. Despite this, the plaintiff continued to play the violin until December of 1985.

During the plaintiff's use of the violin it required serious repair. In November of 1984, the top of the violin was removed, a procedure considered "major surgery" in the bowed-stringed-instrument community. The repair was poorly done, and the violin now has adhesive residue visible on its exterior. At this time, the violin has a crack near the fingerboard and a crack under the chin rest. The neck of the violin was recently broken in transit, although it has since been reattached. Finally, the Court finds from the testimony of Professor R. Kent Perry that the violin has a "buzz" due to either the poor repair or the poor condition of the instrument. The Court finds that the violin is in poorer condition now than it was when purchased by the plaintiff.

Although the defendants presented this evidence of the changed condition of the violin with fervor, they presented a theme without a resolution. No evidence was in-troduced to establish the extent to which the damage and repairs decreased the value of the violin. By failing to complete the theme, the defendants, in effect, leave the Court to speculate as to the measure of the diminution in the value of the violin and thereby improvise the final passage. The Court must, however, decline this offer.

On the crucial question of authenticity, the plaintiff presented the testimony of Lowell Gene Bearden, and the evidence deposition of Frank Passa, both experts in the authentication and appraisal of violins. Bearden, of St. Louis, learned his craft from his father, and has operated his own violin shop for 24 years, where he has crafted three violins. He is a member of the International Society of Violin and Bow Makers, of which there are fewer than 25 members in this country. Frank Passa, of San Francisco, has operated a violin shop for 56 years, serving mostly members of major symphony orchestras. His skill also came under the tutelege of family members. Passa is also a member of the International Society of Violin and Bow Makers, and founded the American Federation of Violin and Bow Makers. Bearden and Passa, while not members of the academic music community, make their living in part from, and have based their reputations on, their ability to correctly identify, authenticate and appraise violins made centuries ago. These men examined the violin in question, and both asserted unequivocally that the instrument is not a Bernardel. They placed its value at between $750 and $2,000.

As counterpoint, defendants offered the testimony of R. Kent Perry, Ph.D., professor of violin and chamber music at Southern Illinois University—Edwardsville. Professor Perry supplemented his testimony by playing brief excerpts from the classics on the violin in question, thereby both educating and entertaining the Court, as had plaintiff at the conclusion of her testimony. While the evidence presented by Professor Perry was helpful to the Court, it is clear that he is not an expert in the field of authenticating violins.

Additional evidence as to the authenticity of the violin as a Bernardel came in the form of the certificate of authenticity issued by Tipple and introduced as a joint exhibit of the parties. Tipple's certificate was less than compelling; it merely stated that it was his "estimation" the violin was a Bernardel.

Defendants also presented the evidence of Mr. Slavik's daughter, Suzanne von Frasunkiewicz, a concert violinist from Brazil, who testified that she had played the violin on tour, found it to be a fine instrument, and believed it to be a Bernardel. Her belief was primarily based on what she had heard over the years in her father's home, and she admitted that she had had no training or experience in authenticating or appraising violins.

The Court finds the evidence presented by plaintiff on the determinative question of authenticity to be the more credible, and finds from a preponderance of the evidence that the violin is not the work of Auguste Sebastien Phillipe Bernardel, and that its value at the time of sale was $2,000.

Despite this, the Court finds that Charles Slavik neither purposefully nor willfully misrepresented the maker or value of the violin, though he referred to the instrument as a Bernardel both orally and on the Bill of Sale. Slavik is neither an expert on the masters of violins, nor is he in the business, occupation or vocation of selling violins.

█ The Court further finds that there has been no evidence that defendant, Rosemary Slavik, had any ownership interest in the violin, nor that she played any role in the sale of the violin to plaintiff. In other words, the sale of this violin was not a duet by the defendants, but rather a solo by Charles Slavik.

## CONCLUSIONS OF LAW

This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $10,-000.

In a diversity action, the choice of law rules of the state in which the district court sits are applied. *Klaxon Co. v. Stentor*

*Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 526 (7th Cir.1981). In contract cases, the Illinois rule is that the law of the place of execution applies when the contract is to be performed in more than one state. *P.S. & E., Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125, 127 (7th Cir.1972). Because the second payment from Bentley was made from Indiana, the 'place of execution' rule will be followed in this case, and Illinois law will be applied by the Court.

█ The plaintiff alleges in Count I that there were misrepresentations made by the defendants to the plaintiff in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, (Consumer Fraud Act), Ill.Rev.Stat. ch. 121½, para. 261–272 (1983). After consideration of the Act and relevant case law, it appears the Consumer Fraud Act does not apply to this dispute. Because there was no purposeful misrepresentation on the part of Charles Slavik, the initial portion of Section 2 of the Act does not apply. Ill.Rev.Stat. ch. 121½, para. 262 (1983). The portion of Section 2 in which the Uniform Deceptive Trade Practices Act (the Uniform Act) is incorporated also does not apply because any alleged violation as described in Section 2 of the Uniform Act must be done by someone "in the course of his business, vocation or occupation...." Ill.Rev.Stat. ch. 121½, para. 312 (1983).

While there appears to be no case law directly on point, courts have interpreted both the Consumer Fraud Act and the Uniform Act as protecting consumers such as Bentley only "against fraud, unfair methods of competition and deceptive *business* practices." *Frahm v. Urkovich*, 113 Ill. App.3d 580, 69 Ill.Dec. 572, 575, 447 N.E.2d 1007, 1010 (1983), *quoting Scott v. Association for Childbirth at Home, Int'l.*, 88 Ill.2d 279, 288, 58 Ill.Dec. 761, 430 N.E.2d 1012 (1982). From the testimony presented to the Court, there appears to be no evidence that Charles Slavik was in the business of selling violins, nor that he sold the violin to Bentley in the course of his business, vocation or occupation. This being so, the Court must conclude that Section 2

of the Uniform Act does not apply to the plaintiff's allegations, and, therefore, she may not recover under the Consumer Fraud Act on Count I.

■ In Count II, plaintiff alleges that misrepresentations made by Charles Slavik violated the Illinois Uniform Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121 para. 312 (1983). A review of the statute and case law shows that the Uniform Act provides only for injunctive relief, *Beard v. Gress*, 90 Ill.App.3d 622, 46 Ill.Dec. 8, 413 N.E.2d 448 (1980), and that attorneys' fees may only be awarded if the Court finds the defendant willfully engaged in deceptive trade practices. The Court has determined in its Findings of Fact that Charles Slavik did not willfully misrepresent the violin's worth to plaintiff. Bentley has not requested injunctive relief. For these reasons the plaintiff may not recover under the Uniform Act on Count II.

The plaintiff alleges in Count III that defendants breached the contract by not delivering a Bernardel. The defendants deny this, and assert that Charles Slavik delivered the violin bargained for and that the contract was ratified through a letter written by the plaintiff on February 13, 1984. Under the Illinois Uniform Commercial Code, Ill.Rev.Stat. ch. 26, para. 2–313(1)(b) (1983), an express warranty is created at time of sale that the goods sold by a seller will conform to any description of the goods that is a part of the basis of the bargain. The plaintiff, in effect, asserts that the certificate of authentication issued by Tipple and the sellers' reference to the violin as a Bernardel, both orally and in the bill of sale, as well as in the announcement letter posted on the bulletin board, was an express warranty by Charles Slavik to plaintiff.

In a similar dispute arising more than 50 years ago, a California Court of Appeals found that a bill of sale reciting the sale of two violins, a "Stradivarius" and a "Guarnerius," served as a warranty from the seller to the buyer that the violins sold were, in fact, Stradivarius and Guarnerius violins. *Smith v. Zimbalist*, 2 Cal.App.2d 324, 38 P.2d 170 (1934), *hearing denied* by California Supreme Court.

To determine whether a warranty was created under Illinois law, the Court must examine the intent of the parties as expressed in the bill of sale and in the circumstances surrounding the sale itself. *Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc.*, 39 Ill.App.3d 48, 349 N.E.2d 627 (1976). This determination is generally considered a question of fact. *Redmac, Inc. v. Computerland of Peoria*, 140 Ill. App.3d 741, 95 Ill.Dec. 159, 489 N.E.2d 380 (1986). When examining ¶ 2–313(1)(b) of the Illinois Uniform Commercial Code, courts have used a "basis of the bargain" test which looks to the descriptions or affirmations forming the basic assumption of the bargain between the parties. *Alan Wood*, at 632.

■ From the evidence presented to the Court, it is clear that the description of the violin as a Bernardel, the affirmation created by the seller's repeated use of the term "Bernardel," and the presentation of a certificate of authentication support the conclusion that there existed a basic assumption that the transaction concerned a 1835 Auguste Sebastien Philippe Bernardel violin. The Court finds that ¶ 2–313(1)(b) applies to this dispute, and that a warranty under the statute was created by Charles Slavik. Consistent with the findings of fact, the Court concludes that an Auguste Sebastien Philippe Bernardel violin was not delivered by Charles Slavik to Bentley, and therefore Slavik breached the contract with plaintiff.

■ The Court further concludes that Bentley's letter to the Slaviks dated February 13, 1984, did not ratify the contract. The concept of ratification includes an understanding and full knowledge of the facts necessary to an intelligent assent. *Black's Law Dictionary* (4th ed. 1968), *citing Coe v. Moon*, 260 Ill. 76, 102 N.E. 1074, 1076 (1916). There has been no evidence that at the time of the February 13, 1984, letter Bentley knew or had reason to know the violin was not a Bernardel. Therefore, no ratification occurred when plaintiff ex-

pressed pleasure with the "Bernardel" in February, 1984.

■ In defendants' Proposed Findings of Fact and Conclusions of Law, counsel asserted that Bentley should be estopped from rescinding the contract because of her 16 month delay in having the violin inspected. Defendants may assert estoppel against Bentley only if they can show they changed position and suffered a detriment as a result of their reliance on the acts and representations of Bentley. *DeProft v. Heydecker*, 297 Ill. 541, 548, 131 N.E. 114 (1921); *Courson v. The Industrial Commission*, 98 Ill.2d 1, 74 Ill.Dec. 48, 455 N.E.2d 78 (1983). In this case, it is possible that the plaintiff's letter may have misled Slavik into believing she had had the violin authenticated. However, there has been no evidence of any reliance or changed position on the part of Slavik. For this reason, estoppel has not been shown.

■ The plaintiff claims $20,000 in damages for the breach of contract allegation of Count III. The Court has concluded there was a breach of contract resulting from the warranty created by Slavik. Under Ill.Rev.Stat. ch. 26 ¶ 2–714(2) (1983), "the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted...." *Id.* The Court has found the violin had a value of $2,000 when sold, and that it was sold for $17,500, a value it would have had were it a Bernardel as warranted.

In this case, the sale may be over, but the warranty lingers on. The plaintiff's measure of damages under Count III, therefore, is $15,500.

Count IV was amended at the close of plaintiff's evidence to allege mutual mistake on the part of buyer and seller. Mutual mistake, as defined in Restatement (Second) of Contracts § 152 (1981), has been recognized in Illinois courts as recently as November, 1986, *Hagenbuch v. Chapin*, 149 Ill.App.3d 572, 102 Ill.Dec. 886, 500 N.E.2d 987 (1986). If a mistake by both parties as to "a basic assumption on

which the contract was made has a material effect on the agreed exchange of performance, the contract is voidable by the adversely affected party...." Restatement (Second) of Contracts § 152 (1981). The *Hagenbuch* decision also provides the adversely affected party with the remedy of the return of the excess purchase price. *Hagenbuch*, 102 Ill.Dec. at 890, 500 N.E.2d at 991. It is this relief the plaintiff appears to request.

■ From the facts already discussed, it appears there did exist a mistake by both parties as to the maker of the violin sold to plaintiff by defendant Charles Slavik. Moreover, it is clear the basic assumption that the violin was a Bernardel materially affected the agreed price, the exchange of performance. Yet it must be determined whether either party assumed the risk of mistake referred to in § 152(1) and explained in § 154, comment c of the Restatement (Second) of Contracts (1981). This Court concludes that neither party assumed the risk.

■ While the conclusion that Slavik did not assume the risk of mistake is apparent from the facts, a similar conclusion as to plaintiff merits further discussion. Thorough examination of § 154(b) and comment c therein reveals that plaintiff did not bear the risk the violin was not a Bernardel. "Conscious ignorance" is defined in comment c as an awareness of a contracting party prior to agreement that it is unknowledgeable about certain facts that later become the basis for the mutual mistake claim. The party that was aware of the uncertainty prior to the contract may not assert mutual mistake of fact, according to comment c.

The Illinois Supreme Court has long recognized that mutual mistakes of fact may make contracts voidable. *Harley v. Magnolia Petroleum Co.*, 378 Ill. 19, 37 N.E.2d 760 (1941). It is further stated that mutual mistakes must have been unknown at the time the contract is made, and that neither party may have borne the risk of any unknown facts. *Harley*, at 765. It is this voluntary bearing of the risk of unknown

facts that the Restatement refers to as "conscious ignorance." The court describes this as a "conscious present want of knowledge of facts" which a party has manifestly concluded will not influence the decision to contract. *Harley*, at 765. Another court has referred to it as an "attitude of indifference." *Southern National Bank of Houston v. Crateo, Inc.*, 458 F.2d 688, 698 (5th Cir.1972). Regardless of the terms used, the Fifth Circuit and the Illinois Supreme Court require a showing that the ignorant party is willing to bear the risk of the unknown facts before that party will be barred from asserting mutual mistake of fact. *Harley*, at 765 and *Southern National Bank*, at 693.

The evidence presented before the Court gives no reason for finding that plaintiff exhibited a willingness to bear the risk that the violin was not a Bernardel. The evidence shows she would not have purchased the violin for the price paid had she not been convinced the violin was a Bernardel. She was not consciously ignorant of, nor did she exhibit an attitude of indifference about, the authenticity of the violin when she purchased the instrument. For these reasons, the Court concludes plaintiff did not bear the risk of mistake under § 154 or § 152 of the Restatement (Second) of Contracts (1981).

The Court therefore concludes that there existed a mutual mistake of fact between defendant, Charles Slavik, and plaintiff, Karen Bentley, and that plaintiff is entitled to return of the excess purchase price paid due to the mutual mistake. The excess price is $15,500, the difference between the $17,500 purchase price, and the value of the violin at the time it was sold, $2,000.

## CADENZA

This case gave the Court an insight into the relationship classical musicians develop with their instruments. The plaintiff referred to violins as "living," "breathing" and possessing "souls." Mr. Slavik spoke of his care of the violin over 33 years of ownership with pride and intensity. It is clear that this dispute concerned more than a simple commercial transaction. The defendant felt his integrity attacked; the plaintiff felt victimized.

While sympathetic, the law is ill-equipped to soothe such emotions. The Court must examine the matter with detachment. Yet, it is this detachment that gives the law a timeless quality similar to that of the music the litigants so love. The law's disinterest gives it consistency, and its consistency, in turn, gives it endurance. It is this enduring quality that the law and great music share. Just as many classic works of music are based on a simple melody, the law of this case is based on a consistent rule: that a seller's description of an item amounts to a warranty that the object sold is as described. Returning to an earlier refrain: the sale may be over, but the warranty lingers on.

## FINALE

In summary, the Court finds in favor of defendant, Rosemary Slavik, and against plaintiff, Karen Bentley, on all four counts of plaintiff's complaint. The Court finds in favor of defendant, Charles Slavik, and against plaintiff, Karen Bentley, on Counts I and II of plaintiff's complaint. The Court finds in favor of plaintiff, Karen Bentley, and against defendant, Charles Slavik, on Counts III and IV of plaintiff's complaint, and awards damages in favor of plaintiff, Karen Bentley, and against defendant, Charles Slavik, in the amount of $15,500. The Clerk of the Court is hereby ORDERED to enter judgment accordingly.

IT IS SO ORDERED.