STATE OF NEBRASKA EX REL. PAUL L. DOUGLAS,
ATTORNEY GENERAL, APPELLEE, v. BETTE BONN
LEDWITH, APPELLANT.

281 N. W. 2d 729

Filed July 10, 1979.   No. 42226.

Bette Bonn Ledwith, pro se.

Paul L. Douglas, Attorney General, and Jerold V. Fennell, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

This appeal arises from the granting of an order permanently enjoining the defendant, Bette Bonn Ledwith, hereinafter referred to by her trade name of Bette Bonn, from engaging in certain trade practices in the course of recruiting students for and operating a school to train fashion models and requiring her to file quarterly reports with the Attorney General for 4 years. The proceedings were initiated by the Attorney General, acting pursuant to authority granted by section 87-303.05 (1), R. R. S. 1943, which is a part of the Nebraska codification of the Uniform Deceptive Trade Practices Act. §§ 87-301 through 87-306, R. R. S. 1943. In his petition, the Attorney General described several trade practices allegedly engaged in by Bette Bonn, stated the practices were deceptive, and requested temporary and permanent injunctive relief and restitution to the victims of such deceptive practices.

After a hearing, the court granted a temporary injunction in July 1976, restraining Bette Bonn from advertising for students in the "Help Wanted" section of certain newspapers and from advertising in a manner which would lead individuals reading the advertisements to believe that paid employment as a model was being offered.

Following an extensive trial on the merits, the court made findings of fact and issued its permanent order in May 1978. Details of the findings and the order will be discussed later in this opinion. Bette

Bonn appealed, making numerous assignments of error. We affirm.

The Attorney General's evidence consisted primarily of the testimony of many former students and some instructors at the Bette Bonn schools. In addition, Bette Bonn was called as a witness and examined at some length. The evidence established a virtually unvarying pattern of behavior which may be generally summarized without specific reference to the testimony of individuals.

For a number of years, Bette Bonn ran the Bette Bonn Schools of Modeling and Charm in Nebraska and elsewhere. There were two schools in Nebraska, one of which was in Lincoln and the other in Omaha. The business was almost entirely confined to instruction; Bette Bonn did not make a practice of finding employment for professional models who were not enrolled in her schools.

Bette Bonn regularly ran advertisements in the "Help Wanted" section of the classified advertisements of Omaha and Lincoln newspapers which varied from the following only in minor details:

"MODELS — BETTE BONN
STATE DIRECTOR
World Modeling Association
OUR 28TH YEAR
OMAHA-LINCOLN
All ages, sizes. *No training fee for professionals.* See our models 'Lincoln Home Show,' 'ETV Auction, Channels 12 and 13,' beginning soon. 342-7560 New Paxton 346-3330" (Emphasis supplied.)

Most students' initial contact with Bette Bonn came about because they were reading the "Help Wanted" section of the classified advertisements. Some students responded to the advertisement because they wanted to become professional models on a full or part-time basis while others believed the advertisement was offering paid employment.

Those calling for information were given an appointment for an interview with Bette Bonn. The interviews, which Bette Bonn always conducted personally, generally lasted from ½ hour to 1 hour. During the interview, Bette Bonn described the courses and fees and made a number of representations concerning the nature and value of the courses.

Three courses of instruction were available, but most or all of the students chose to enroll in the professional modeling course. This course was to consist of 92 lessons. Its price during the time period at issue was $345 initially and $445 later in the period if paid in full before starting the course. There was a $45 surcharge if the price was to be paid in installments. Students were given the option of paying half the installment price and working off half through modeling jobs which they were assured they would obtain while they were students.

Prospective students were led to believe they would earn back all of the tuition money on modeling assignments and probably make a profit while they were still students. They were told there was a great demand for models in Lincoln and Omaha, and they would have no trouble obtaining full or part-time employment upon completion of the course. They also believed Bette Bonn would obtain jobs for them after they completed their training.

Students were promised a "model's card" upon completion of the course which they were told they could show at any modeling agency in the country. It is clear the students believed the card would be at least the equivalent of a diploma in that it would provide nationally recognized certification of completion of an approved course of study.

All of these representations were false in various respects. Most students were given the opportunity to do a few modeling jobs while in school, although many of the jobs involved work such as passing out sample cigarettes on a street corner or acting as a

hostess at a trade show. Such jobs were systematically assigned first to students who had signed up to pay half the tuition and work off half. Where students who had paid the tuition in full or who had completed working off their tuition were assigned such jobs, they generally found it impossible to get paid for doing them, although many had specifically inquired as to whether there would be payment for doing the work and had been assured there would be. No student testified she "earned" enough, even considering hours worked for which no payment was forthcoming, to recover the cost of the tuition.

The classes had little if any content, were haphazardly scheduled, and were frequently canceled without notice. Some students quit the course in disgust after arriving at the school several times, finding no one there, and being unable to have their calls returned.

Most students who completed the course were unable to obtain the modeling card. It would have done them no good to obtain it, because the card was worthless for obtaining employment in Nebraska or anywhere else. One of Bette Bonn's own exhibits, a letter from the World Modeling Association, stated: "An association is not capable of accrediting its members. . . . If any association in the modeling field is claiming to give accreditation, this is not true." Thus, the card had no value even as a diploma.

Nancy Bounds Scounce, the owner of the Nancy Bounds School of Modeling in Omaha, was called by the plaintiff and qualified as an expert. She testified that Omaha and Lincoln simply could not support full-time professional models. Instructors from the Bette Bonn schools who testified could not recall that any student who completed the professional modeling course had become a full-time professional model. Bette Bonn, when called as a witness for the plaintiff, could name only two or three people who

had obtained full-time employment as a model after completing her course.

It is inferable from the record that most students never saw Bette Bonn again after they paid their tuition. Bette Bonn's first strategy for dealing with student complaints was to ignore all telephone messages. If students were undeterred by being ignored, they would be abruptly expelled. One student who was expelled was accused of being a spy for the rival model agency and the excuses could be vaguer than that. No tuition was ever refunded under any circumstances.

In his pleadings, the Attorney General alleged Bette Bonn's method of advertising was deceptive in that it led readers to believe paid employment was being offered when Bette Bonn was actually soliciting students. In addition, Bette Bonn was alleged to be representing to those who responded to the advertisements that paying modeling jobs were immediately available to those enrolled in the school and Bette Bonn would obtain modeling jobs for students when they completed the modeling course; that a "model's card" or some other document was required to model in Lincoln and Omaha; and that the modeling course involved a specific number of lessons in regularly scheduled classes. All of these representations were alleged to be deceptive in that there were few paid jobs available to students, either when enrolled in the course or upon completion of it; no card or certification is required to obtain a modeling job in Nebraska and Bette Bonn was not, in any event, associated with an organization granting certification to models; and classes were not delivered as promised, and few students were able to complete the course.

The Attorney General further alleged that numerous Nebraska residents had incurred actual damages as a result of such practices, and requested injunctive relief, restitution, and retention of contin-

uing jurisdiction by the court for the purpose of ordering further equitable relief.

The trial court made extensive and detailed findings of fact which essentially found the Attorney General's allegations to be true and expanded upon them. The court then ordered that Bette Bonn be permanently enjoined from: (1) Advertising for prospective students in the "Help Wanted" column of newspapers printed in Nebraska or delivered to Nebraska residents; (2) advertising for students in any manner which would lead individuals to believe the advertisements were for paid employment; (3) representing that students would receive paid employment during training unless the student is supplied with a current list of jobs and a list of students who received paying jobs while in training; (4) representing that employment as a model would be available on completion of training unless it is true and students are supplied with written information of positions available and names of graduates of Bette Bonn's school who have obtained employment; (5) representing that a "model's card" is necessary to model in Nebraska or that Bette Bonn is authorized by any official organization to issue such a card; and (6) expelling any student without just cause set forth in writing and without refunding tuition on a pro rata basis.

To aid in enforcement of the court's order, Bette Bonn was ordered to make quarterly reports to the Attorney General for 4 years. The reports were to contain all current business addresses, the names and addresses of all students enrolled in the school during the preceding 3 months, and copies of all advertising utilized in the preceding 3 months.

The court held that restitution was not warranted but retained jurisdiction to hold a hearing on the matter should there be a showing of any active practice violating the Uniform Deceptive Trade Prac-

tices Act or the court order in future business transactions.

Six of the assignments of error relate to various aspects of the proceedings wherein the temporary injunction was granted. As it is not within the province of this court to determine moot questions, we must first determine whether these assignments raise anything other than abstract legal issues. Kansas-Nebraska Nat. Gas Co., Inc. v. Wiles, 190 Neb. 795, 212 N. W. 2d 633. Obviously, the granting of a temporary injunction could have no effect on the final outcome of the case. Thus, the only actual issue which might be affected by our consideration of these questions is the right to damages of the party enjoined.

Generally, no tort liability arises for bringing an action in civil courts unless malicious prosecution can be proved. This rule applies where a party has wrongfully obtained an injunction and there can be no recovery in the absence of some statutory liability unless the prosecution was malicious. At common law there is no liability in tort for wrongful issuance of an injunction absent the elements necessary to prove malicious prosecution. United States Steel Corp. v. United Mine Wkrs. of Amer., 456 F. 2d 483 (3rd Cir., 1972); Camp v. Atlantic Refining Co., 179 S. W. 2d 326 (Tex. Civ. App., 1944); 43A C. J. S., Injunctions, § 314, p. 693.

Nebraska has a statute requiring the posting of bond before most temporary injunctions may be effective. § 25-1067, R. R. S. 1943. As in the case in all jurisdictions which we have examined, the party enjoined may recover damages on the bond only "if it be finally decided that the injunction ought not to have been granted." *Id.* See, United States Steel Corp. v. United Mine Wkrs. of Amer., *supra;* House of Vision, Inc. v. Hiyane, 42 Ill. 2d 45, 245 N. E. 2d 468; Electric Co-op., Inc. v. Ferguson, 124 Mont. 543, 227 P. 2d 597. Where, as in this case, trial on the

merits results in a final judgment against the party enjoined, there can be no liability on the bond.

Thus, at least one court has held that where there is a final judgment against the party enjoined, the temporary injunction merges into the final decree and any questions concerning the propriety of the issuance of the temporary injunction become moot. Valentine. v. Valentine, 31 Wash. 2d 650, 198 P. 2d 494; State ex rel. Carroll v. Simmons, 61 Wash. 2d 146, 377 P. 2d 421. We hold that in this case all questions concerning the issuance of the temporary injunction are moot.

Several of the assignments of error may be dealt with simply by reference to the act under which this action was brought. Bette Bonn argues the Attorney General is not authorized to bring an action of this nature. Section 87-303.05 (1), R. R. S. 1943, grants such authorization in unmistakable terms: "Whenever the Attorney General has cause to believe that a person has engaged in or is engaging in any deceptive trade practice or unconscionable act listed in section 87-302 or 87-303.01, he may apply for and obtain, in an action in any district court of this state, a temporary restraining order, or injunction, or both, pursuant to the rules of civil procedure, prohibiting such person from continuing such practices, or engaging therein, or doing any act in furtherance thereof." The section continues: "The court may make such orders or judgments as may be necessary to prevent the use or employment by such person of any such deceptive trade practice, or which may be necessary to restore to any other person any money or real or personal property which may have been acquired by means of any such practice." The court was clearly acting within its powers under this section in retaining jurisdiction to order restitution and in requiring the quarterly reports to the Attorney General, and the assignments of error on these points are without merit. As there was no final or-

der requiring restitution, the question of the sufficiency of the pleadings to support such an order need not be considered at this time. § 25-1911, R. R. S. 1943.

Next, Bette Bonn insists these proceedings are criminal rather than civil in nature and argues she was denied the rights granted to defendants in criminal proceedings. It is true that sections 87-303.08 and 87-303.09, R. R. S. 1943, provide for criminal sanctions for engaging in deceptive trade practices. However, those sections are not pertinent here as no attempt has been made to institute proceedings under them.

Section 87-303.05 (1), R. R. S. 1943, clearly contemplates a civil proceeding and provides only for civil remedies and not for criminal sanctions. See 1 Wharton's Criminal Law (14th Ed., 1978), § 6, p. 19. The statute has none of the earmarks of criminal proceedings which led to our holding in State v. Knoles, 199 Neb. 211, 256 N. W. 2d 873. We hold that proceedings brought under this section are civil in nature.

The last assignment of error relating directly to the language of the statute is the assertion that whether the Attorney General has "cause to believe" is an essential element of the cause of action which was not proven. A demurrer by Bette Bonn was apparently sustained because the allegation of "cause to believe" was omitted from the pleadings, and the Attorney General was given leave to amend the petition by interlineation.

There are two types of action which we have been able to discover in which proof of "cause to believe" is an essential element of the cause of action. In actions for malicious prosecution, plaintiff must plead and prove lack of probable cause. Rose v. Reinhart, 194 Neb. 478, 233 N. W. 2d 302. In an action against a police officer for false imprisonment, probable cause to believe that plaintiff had committed a

crime is a defense. Diers v. Mallon, 46 Neb. 121, 64 N.W. 722. In both of these actions, the element of probable cause is intertwined with and materially related to the facts creating the cause of action.

In this action, whether the Attorney General has "cause to believe" is irrelevant to whether deceptive trade practices actually exist. The only reasonable basis for its existence in the statutes is to prevent random investigations by the Attorney General's office. This conclusion is reinforced by the fact that "cause to believe" must also exist before the Attorney General's investigative powers under the act come into play. § 87-303.02, R. R. S. 1943.

We hold the requirement in section 87-303.05 (1), R. R. S. 1943, that the Attorney General have cause to believe deceptive trade practices exist or have existed before instituting an action is not an essential element of the action which must be proved at trial. Rather, the requirement is akin to the probable cause which must exist before a search warrant may be issued, and the Attorney General may be required to show he has some evidence leading him to believe a deceptive trade practice exists or has existed if the institution of the action is challenged early in the proceedings.

Two of the remaining assignments of error concern the sufficiency of the evidence to support the findings of the trial court. Equity actions are heard de novo in this court with consideration given to the fact the trial court observed the witnesses and their manner of testifying. Bailey v. Mahr, 199 Neb. 29, 255 N. W. 2d 866.

Applying this standard, we find the evidence strongly supports the trial court's finding that Bette Bonn was acting as a sole proprietor during the times pertinent to this action and that Evelyn Parker, an instructor at the Lincoln school, was only an agent or employee of Bette Bonn's. Evelyn Parker had no control over the operation of the school, did

not decide whether to accept students, did not participate in the selection of advertising or contribute to the rent, and seems to have received a salary of $50 per week although the compensation was termed a commission.

The evidence also supports the granting of the permanent injunction. Bette Bonn argues the injunction should not have been issued because she was not doing business at the time of trial. An injunction is a remedy designed to control future behavior, and whether that behavior is occurring at the time of the decree granting the injunction is generally irrelevant to the propriety of its issuance. Michelsen v. Dwyer, 158 Neb. 427, 63 N. W. 2d 513; Hughes Farms, Inc. v. Tri-State G. & T. Assn., Inc., 182 Neb. 791, 157 N. W. 2d 384.

The record as a whole supports the conclusion that Bette Bonn was absolutely convinced she had a right to conduct business in the manner described in this opinion and that she would never change her methods of operation voluntarily. In addition, in a letter written to Evelyn Parker in connection with similar proceedings in Iowa, Bette Bonn stated: "[I]t is my intention to appeal [the] . . . decision to the Iowa Supreme Court. *If that appeal should succeed, it is my intention to resume business operations in Iowa.*" (Emphasis supplied.) There is every reason to believe Bette Bonn had similar intentions regarding the proceedings in this state, and the issuance of the permanent injunction was entirely justified.

Next, it is urged the court erred in granting the Attorney General's motion for an order requiring the production of certain business records belonging to Bette Bonn in that the Attorney General failed to show good cause upon which such an order must be based. § 25-1267.39, R. R. S. 1943. The challenged order recites that a hearing was held and contains specific findings of fact stating that good cause was shown for the production of each category

of documents requested by the State. No bill of exceptions from that hearing has been included in the record submitted to this court. Where any fact issue is presented on appeal, in the absence of a bill of exceptions it is presumed the trial court's finding is correct. Hubbell v. Farmers Ins. Group, 200 Neb. 472, 263 N. W. 2d 863; Schreiner v. Irby Constr. Co., 184 Neb. 222, 166 N. W. 2d 121.

Perhaps the most unusual assignment of error in this case is the one urging that the Uniform Deceptive Trade Practices Act should have been declared unconstitutional by a default judgment. The background to this assignment is that a "counterclaim" alleging the Uniform Deceptive Trade Practices Act violates the Constitutions of the United States and the State of Nebraska was filed early in these proceedings. The State did not reply, and Bette Bonn then moved for a judgment by default. This motion was overruled. Subsequently, the court found in its conclusions of law that the allegations in the "counterclaim" constituted affirmative defenses and that the State had no duty to file a pleading in response thereto. We find the court's conclusion to be entirely correct.

Even assuming a default judgment may be granted on a counterclaim, a counterclaim "must be more than a mere defense to plaintiff's cause of action, or in reduction of his damages; 'it must be an existing, valid, and enforceable cause of action in favor of the defendant against the plaintiff.' " McGerr v. Marsh, 148 Neb. 50, 26 N. W. 2d 374. Thus, a counterclaim must allege facts sufficient to support an independent cause of action. Reserve Loan Life Ins. Co. v. Benson, 167 S. W. 266 (Tex. Civ. App., 1914). Mere allegations that a statute is unconstitutional do not meet this standard.

Finally, we note that Bette Bonn's fear she will be held to have waived her rights of appeal by complying with the court order and making quarterly re-

ports to the Attorney General during the pendency of the appeal is groundless. That rule applies only where a party accepts the benefits of a decree in his favor and not where compliance with the decree is involuntary or compelled. See, Larabee v. Larabee, 128 Neb. 560, 259 N. W. 520; Reynek v. Reynek, 193 Neb. 404, 227 N. W. 2d 578.

All other assignments of error have been considered and found to be without merit.

AFFIRMED.