(No. 53802.—

WILLIAM J. SCOTT, Attorney General, Appellant, v. ASSOCIATION FOR CHILDBIRTH AT HOME, INTERNATIONAL, *et al.,* Appellees.

*Opinion filed November 20, 1981.—Rehearing denied January 29, 1982.*

Tyrone C. Fahner, Attorney General, of Springfield (Joseph D. Keenan III and Patricia Rosen, Assistant Attorneys General, of Chicago, of counsel), for the People.

Leahy & Leahy, of Springfield (Mary Lee Leahy and Andrew J. Leahy, of counsel), for appellee.

JUSTICE CLARK delivered the opinion of the court:

This appeal concerns the investigative powers of the Attorney General under the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1977, ch. 121½, par. 261 *et seq.*) (the Act). On October 10, 1978, the Attorney General initiated an investigation of the Association for Childbirth at Home, International (the Association), by issuing to the Association, pursuant to section 3 of the Act, a requirement to file a verified statement responding to specific inquiries within 10 days of service. The requirement included a demand for copies of certain records. On the same date an administrative subpoena was issued, pursuant to section 4 of the Act, requiring the Association to appear and testify concerning its business transactions with Illinois consumers, specifically its series of childbirth classes conducted in Illinois since 1976. (The subpoena also required the production of the same documents specified in the requirement.) Following the Association's failure to respond to the requirement and subpoena, the Attorney General, on October 25, 1978, brought separate suits, pursuant to section 6 of the Act, in the circuit court of Sangamon County against the Association and its Midwest Regional Coordinator, Cathryn S. Feral. The complaints sought orders to compel the defendants to comply with the requirement and subpoena and also, pending compliance, to enjoin defendants from conducting any business or advertising in Illinois. On defendants' motion, the suits were consolidated.

On March 24, 1980, the circuit court granted defendants' motion to dismiss the complaints for failure to state a cause of action. The court found that the subpoena and requirement were deficient because they had been signed by an assistant Attorney General rather than by the Attorney

General personally, and the Act contained no specific delegation to the assistant Attorney General of the Attorney General's powers. The plaintiff appealed.

On June 20, 1980, the Appellate Court for the Fourth District affirmed the circuit court's dismissal of the complaints. (85 Ill. App. 3d 311.) The appellate court, however, explicitly rejecting the circuit court's reasoning, based its decision on its holding that part of section 2 of the Act (Ill. Rev. Stat. 1977, ch. 121½, par. 262), which prohibits unfair acts and practices in the conduct of trade or commerce, was unconstitutionally vague. We granted the Attorney General's petition for leave to appeal.

The Association contends, as a threshold issue, that the Act does not apply to it. The Association is a California corporation engaged in educating and training parents in the area of childbirth, and in training teachers in childbirth education, specifically oriented toward childbirth at home. The Association argues that the sale of educational services is not "trade or commerce" within the meaning of the Act. We find this argument to be without merit. Section 2 prohibits unfair and deceptive practices "in the conduct of *any* trade or commerce." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 121½, par. 262.) Section 1(f) defines "trade or commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." (Ill. Rev. Stat. 1977, ch. 121½, par. 261.) This broad language evidences an intent that the Act have correspondingly broad applicability. We find no indication in the Act's language and purpose of a legislative intent to exclude the advertising and sale of educational and training services from its coverage. We note that section 10b (Ill. Rev. Stat. 1977, ch. 121½, par. 270b), while it excludes transactions by a number of entities, fails to exclude trans-

actions by educational institutions. Moreover, it is clear that purchasers of educational services may be as much in need of protection against unfair or deceptive practices in their advertising and sale as are purchasers of any other service. See, *e.g.*, *State ex rel. Douglas v. Ledwith* (1979), 204 Neb. 6, 281 N.W.2d 729 (deceptive practices by operator of professional modeling school properly enjoined), and cases cited in Annot., *Practices Forbidden by State Deceptive Trade Practice and Consumer Protection Acts*, 89 A.L.R.3d 449, 534-35 (1979).

The Association cites our decision in *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, for the proposition that the Act does not apply to educational institutions. In *Steinberg* we held that a rejected applicant to the medical school had no cause of action under the Act. (69 Ill. 2d 320, 328.) However, the issue before the court there was the right of a private person to sue under the Act, not the right of the Attorney General to investigate or the scope of the Act's regulation. The court held that the Act did not provide a remedy for persons in Steinberg's position, because he, as an applicant, was not a "consumer"—that is, he was not a *purchaser* of educational services. We do not believe that *Steinberg* can be read as holding either that educational institutions are exempt from the Act or that students are not entitled to sue for violations.

We now consider the issue on which the decision of the appellate court turned: whether section 2 of the Act is void for vagueness. Due process, of course, requires that statutory language give fair notice of what conduct is prohibited. A statute is unconstitutionally vague when its terms are so indefinite that "persons of common intelligence must necessarily guess at its meaning and differ as to its application." (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 300.) The Association contends, however, that the Act is subject to a stricter standard, first, because it affects the exercise of rights protected by the first and fourteenth amendments to

the Federal Constitution and, second, because it is a penal statute. Citing cases in which the United States Supreme Court invalidated statutes on the ground of vagueness, the Association argues that where a statute is capable of being applied to conduct protected by the first amendment, the due process clause of the fourteenth amendment "demands a greater degree of specificity than in other contexts." *Smith v. Goguen* (1974), 415 U.S. 566, 573, 39 L. Ed. 2d 605, 612, 94 S. Ct. 1242, 1247.

What are the activities that the Association claims require us to hold the Act to this stricter standard, and how does the Act affect them? The Association's childbirth-training activity, it asserts, is "intimately related" to the exercise by parents of constitutionally protected rights of privacy and freedom of personal choice in matters relating to the decision to have children, as well as to their rearing and nurture. The Consumer Fraud and Deceptive Business Practices Act is aimed at regulation, not of fundamental rights, but of unfair, fraudulent and deceptive business practices. Even assuming that prospective parents do have a constitutionally protected right to learn about or to practice home childbirth, the Act affects it only incidentally, if at all, and we do not believe it impermissibly encroaches on a constitutionally protected area.[1]

We reject the Association's argument that the Act must be held to a stricter standard of definiteness because it is

---

[1] The Association cites numerous decisions of the United States Supreme Court that recognize the rights of privacy and freedom of personal choice in family matters as "fundamental." (*Meyer v. Nebraska* (1923), 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 571 (childbearing and education); *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary* (1925), 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571 (childrearing and education); *Prince v. Massachusetts* (1944), 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (religious training of children); *Skinner v. Oklahoma ex rel. Williamson* (1942), 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (procreation); *Griswold v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (contraception); *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (custody of minor child). These decisions concern direct regulation of these fundamental interests and are inapplicable to the case at hand.

capable of reaching constitutionally protected speech. In recent years it has been recognized that even "purely commercial" speech is entitled to a limited degree of first amendment protection. (*Bigelow v. Virginia* (1975), 421 U.S. 809, 44 L. Ed. 2d 600, 95 S. Ct. 2222; *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817.) However, the Supreme Court has repeatedly emphasized that the first amendment is not a bar to State regulation prohibiting false, misleading or deceptive commercial speech. (*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 771, 48 L. Ed. 2d 346, 364, 96 S. Ct. 1817, 1830; *Bates v. State Bar of Arizona* (1977), 433 U.S. 350, 383, 53 L. Ed. 2d 810, 835, 97 S. Ct. 2691, 2708.) "By definition, commercial speech is linked inextricably to commercial activity: while the First Amendment affords such speech 'a limited measure of protection,' it is also true that 'the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.'" (*Friedman v. Rogers* (1979), 440 U.S. 1, 10-11 n.9, 59 L. Ed. 2d 100, 110 n.9, 99 S. Ct. 887, 894 n.9, quoting *Ohralik v. Ohio State Bar Association* (1978), 436 U.S. 447, 456, 56 L. Ed. 2d 444, 453, 98 S. Ct. 1912, 1918.) Thus the investigation and regulation of unfair or deceptive business practices under the Act does not, because it cannot, impinge upon constitutionally protected speech. Since the Act prohibits only such speech as amounts to a fraudulent or deceptive practice, *i.e.*, false or misleading advertising, it can affect only speech that is by definition outside the ambit of first amendment protection, and within the scope of permissible State regulation. The Association's right to impart truthful and accurate information concerning its services was not threatened by the Attorney General's investigation. Moreover, there is little likelihood that *protected* speech would be inhibited or "chilled" by the Act. As the court stated in

*Bates:* "Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech." 433 U.S. 350, 383, 53 L. Ed. 2d 810, 835, 97 S. Ct. 2691, 2709.

We find the Association's argument that the Act must be held to a strict standard of definiteness because it is penal in nature to be entirely without merit. The Act is a regulatory and remedial enactment intended to curb a variety of fraudulent abuses and to provide a remedy to individuals injured by them. Its stated purpose, set forth in its preamble, is to protect Illinois consumers, borrowers, and businessmen against fraud, unfair methods of competition, and other unfair and deceptive business practices. The Act is clearly within the class of remedial statutes which are designed to grant remedies for the protection of rights, introduce regulation conducive to the public good, or cure public evils. (82 C.J.S. *Statutes* § 388 (1953); see *American Buyers Club v. Honecker* (1977), 46 Ill. App. 3d 252, 257.) The fact that a civil penalty of up to $50,000 can be imposed does not make the Act a penal statute. (See *Helvering v. Mitchell* (1938), 303 U.S. 391, 399-401, 82 L. Ed. 917, 921-23, 58 S. Ct. 630, 633-34; *One Lot Emerald Cut Stones v. United States* (1972), 409 U.S. 232, 237, 34 L. Ed. 2d 438, 443, 93 S. Ct. 489, 493.) Rather, as in the case of the Environmental Protection Act, the penalty is but one part of the regulatory scheme, intended as a supplemental aid to enforcement rather than as a punitive measure. *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 490.

In light of the foregoing, we conclude that whether section 2 is void for vagueness is to be determined by the inquiry whether it is sufficiently clear and definite as to give adequate notice to persons of reasonable intelligence of what conduct it proscribes. Section 2 declares to be unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or

employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce ***." (Ill. Rev. Stat. 1977, ch. 121½, par. 262.) The section further directs that it be construed in light of the interpretations given to section 5(a) of the Federal Trade Commission Act (15 U.S.C. §45(a) (1976)) by the decisions of the Trade Commission and the Federal courts.

We believe that such words as "deception," "false pretense," "misrepresentation," and "fraud," while they are descriptive and generic terms, are words commonly used and understood by the general public and by businessmen. They are "sufficiently explicit to inform those who are subject to [the Act] of the conduct on their part to which it applies" (*Stein v. Howlett* (1972), 52 Ill. 2d 570, 580), and therefore cannot be said to be unconstitutionally vague. (*Stein v. Howlett* ("constructive control" and "close economic association," in Governmental Ethics Act, not vague); *Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287 ("business entity" and "direction or authorization of a responsible official" in Illinois Purchasing Act commonly used and understood, and not vague).) In *Chastek v. Anderson* (1981), 83 Ill. 2d 502, we held that the term "unprofessional conduct" as used in the dental-licensing statute was not unconstitutionally vague, noting that it was susceptible of common understanding by those to whom it applied, and that, in light of the statutory purpose, it provided fair notice to licensed professionals that acts of incompetent treatment would be grounds for license revocation. (83 Ill. 2d 502, 509-10.) Similarly, businessmen subject to regulation by the Consumer Fraud and Deceptive Business Practices Act may

reasonably be expected to understand what is comprehended by such common expressions as "misrepresentation."

The Association finds the word "unfair," as in the phrases "unfair methods of competition" and "unfair \*\*\* acts or practices \*\*\* in the conduct of any trade or commerce," particularly ambiguous and objectionable. However, this very language—taken from section 5(a) of the Federal Trade Commission Act—has a venerable history of interpretation and definition by the Federal courts, and now can be said to have a well-settled meaning in Federal trade-regulation law. (See *Federal Trade Com. v. Sperry & Hutchinson Co.* (1972), 405 U.S. 233, 31 L. Ed. 2d 170, 92 S. Ct. 898; *Spiegel, Inc. v. Federal Trade Com.* (7th Cir. 1976), 540 F.2d 287.) The statutory references to the Federal courts' interpretations and to section 2 of the Deceptive Trade Practices Act further define and clarify its meaning.

The terms "unfair practice" and "unfair methods of competition" are inherently insusceptible of precise definition. As we recognized when the issue of the vagueness of section 2 was first before us, effective regulation requires that the concept be flexible, defined on a case-by-case basis, "in view of the futility of attempting to anticipate and enumerate all the [unfair] methods" and practices that fertile minds might devise. (*Fitzgerald v. Chicago Title & Trust Co.* (1978), 72 Ill. 2d 179, 185-86. See also *People v. Raby* (1968), 40 Ill. 2d 392, 396; *Stein v. Howlett* (1972), 52 Ill. 2d 570, 579-81, and cases there cited.) Greater leeway in definition is allowed the legislature in the context of regulatory statutes governing business activities. (*Papachristou v. City of Jacksonville* (1972), 405 U.S. 156, 162, 31 L. Ed. 2d 110, 116, 92 S. Ct. 839, 843. *United States v. National Dairy Products Corp.* (1963), 372 U.S. 29, 9 L. Ed. 2d 561, 83 S. Ct. 594 (Robinson-Patman Act).) We therefore hold that the terms "unfair methods of competition" and "unfair acts or practices" have a sufficiently definite and well-established

meaning to overcome the charge of vagueness, and join the courts of other States that have so held with respect to comparable legislation. *Department of Legal Affairs v. Rogers* (Fla. 1976), 329 So. 2d 257, 267; *State v. Reader's Digest Association, Inc.* (1972), 81 Wash. 2d 259, 501 P.2d 290; *State ex rel. Sanborn v. Koscot Interplanetary, Inc.* (1973), 212 Kan. 668, 512 P.2d 416.

The Association's contention that section 2 is unconstitutional because it fails to provide an adequate standard to guide the discretion of enforcement officials is another version of its vagueness challenge. The Association relies on *Smith v. Goguen* (1974), 415 U.S. 566, 39 L. Ed. 2d 605, 94 S. Ct. 1242, and *Papachristou v. City of Jacksonville* (1972), 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839, in which the United States Supreme Court focused on a particular vice of vague statutory language: that it leaves it entirely up to law-enforcement officials in their "unfettered discretion" to decide when and whom to prosecute, thus permitting arbitrary and discriminatory enforcement of the law. These decisions, which involved criminal statutes that impinged directly on expression protected by the first amendment, are inapposite. As our previous discussion should have made clear, this case does not involve an attempt to regulate *protected* speech or an impermissible infringement of personal liberty protected by the fourteenth amendment. The United States Supreme Court itself noted that the rather stringent vagueness analysis of the first amendment cases is inapplicable in the context of business regulation. (*Papachristou v. City of Jacksonville* (1972), 405 U.S. 156, 161, 31 L. Ed. 2d 110, 115, 92 S. Ct. 839, 842; *Smith v. Goguen* (1974), 415 U.S. 566, 573, 39 L. Ed. 2d 605, 612, 94 S. Ct. 1242, 1247; *United States v. National Dairy Products Corp.* (1963), 372 U.S. 29, 36, 9 L. Ed. 2d 561, 568, 83 S. Ct. 594, 599.) Finally, our conclusion that section 2 is sufficiently definite to serve as a guide to those who must comply with it disposes of the contention that the Attorney General is left

without a guide in enforcing the Act. Just as section 2 defines what conduct is prohibited, it defines what conduct is properly the subject of the Attorney General's investigative and enforcement activities.

The Association next challenges the constitutionality of sections 3 and 4 of the Act.[2] It contends that statutory authorization of an investigation upon the Attorney General's "mere belief" that one would be in the public interest, with no requirement that he allege the facts forming the basis of his belief, violates the fourth amendment's prohibition on unreasonable searches and seizures, as well as the due process clause of the fourteenth. In effect, the Association asserts that a probable cause standard should govern the initiation of administrative investigations under the Act. It also contends that the Attorney General's subpoena was so unreasonable in its demands and general in its terms as to amount to a "constructive search."

The appellate court rejected the first contention, stating: "Issuance of the administrative subpoena is not dependent upon the pendency of a charge or the existence of probable cause." (85 Ill. App. 3d 311, 319.) It did not discuss the Association's arguments directed to the requirement to file the verified statement and subpoena. We note, however,

---

[2] Under section 3, the Attorney General is empowered to initiate investigations in three circumstances: (1) when he becomes aware of an existing or threatened violation; (2) when a consumer has filed a written complaint; and (3) when he believes that an investigation to ascertain whether a person has violated, is violating, or is about to violate the Act would be in the public interest. In aid of his investigation, the Attorney General may require preparation of a written report containing such information as he may consider necessary; to take sworn testimony from any person in connection with the conduct of any trade or commerce; and to examine any merchandise, record, book, document, account or paper as he may consider necessary. (Ill. Rev. Stat. 1977, ch. 121½, par. 263.) Section 4 authorizes the Attorney General to issue subpoenas, administer oaths and affirmations, conduct hearings, and prescribe rules and regulations to accomplish the objectives and carry out the duties prescribed by the Act. Ill. Rev. Stat. 1977, ch. 121½, par. 264.

that much of the Association's memorandum in support of its motion to dismiss in the circuit court was devoted to this second issue. The parties have argued and briefed both issues extensively before this court. While we agree with the appellate court's conclusion on the probable cause issue, we think it is appropriate—both to clarify our opinion and to speed the conclusion of this litigation after remand to the circuit court—to discuss both issues in some detail.

As the appellate court recognized, it has been settled since *Oklahoma Press Publishing Co. v. Walling* (1946), 327 U.S. 186, 90 L. Ed. 614, 66 S. Ct. 494, that the Federal Constitution does not require a showing of probable cause as a prerequisite to a Federal agency's initiating an administrative investigation. In *Oklahoma Press Publishing,* the Federal Wage-Hour Administrator, acting under his authority to ascertain whether petitioners were violating the Fair Labor Standards Act, issued administrative subpoenas for specified records. The United States Supreme Court held that no unreasonable search or seizure was involved in judicial enforcement of the subpoenas, stating, "It is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one." (327 U.S. 186, 208-09, 90 L. Ed. 614, 629-30, 66 S. Ct. 494, 505.) Rather, "[the Administrator's] investigative function, in searching out violations with a view to securing enforcement of the Act, is essentially the same as the grand jury's, *** and is governed by the same limitations. These are that he shall not act arbitrarily or in excess of his statutory authority, but this does not mean that his inquiry must be 'limited by forecasts of the probable result of the investigation.'" 327 U.S. 186, 216, 90 L. Ed. 614, 634, 66 S. Ct. 494, 509.

In *United States v. Morton Salt Co.* (1949), 338 U.S. 632, 94 L. Ed. 401, 70 S. Ct. 357, the court further elaborated its views as to the constitutional limitations on administrative

investigations. In upholding the Federal Trade Commission's authority to require reports showing compliance with previous cease and desist orders, the court said:

"The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. *** [An administrative agency] has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." 338 U.S. 632, 642-43, 94 L. Ed. 401, 410-11, 70 S. Ct. 357, 364.

The issue of the fourth amendment's limitations on administrative investigations was presented to this court in *Vissering Mercantile Co. v. Annunzio* (1953), 1 Ill. 2d 108. The challenge there was to the investigative powers granted the Department of Labor under the Illinois minimum wage law. The court relied on *Oklahoma Press Publishing* in holding that the statute did not offend the search and seizure provisions of either the Illinois or the Federal Constitution. Other Illinois cases have approved the reasoning of these decisions. *People v. Allen* (1951), 410 Ill. 508; *Illinois Crime Investigating Com. v. Buccieri* (1967), 36 Ill. 2d 556; *People v. Crawford Distributing Co.* (1972), 53 Ill. 2d 332.

The foregoing decisions are still sound and set forth the appropriate standards for assessing the constitutionality of administrative investigations such as this one. The authority of the *Morton Salt* and *Oklahoma Press Publishing* decisions is unquestioned in the Federal system. (See *United States v. Powell* (1964), 379 U.S. 48, 13 L. Ed. 2d 112, 85 S. Ct. 248; 1 K. Davis, Administrative Law §§ 4:4, 4:5 (2d ed. 1978).) They have been followed by the courts of several States in upholding similar provisions for investigation in their con-

sumer protection statutes.[3] *Commonwealth ex rel. Hancock v. Pineur* (Ky. 1976), 533 S.W.2d 527; *Steele v. State ex rel. Gorton* (1975), 85 Wash. 2d 585, 537 P.2d 782; *Cuna Mutual Insurance Society v. Attorney General* (1980), 380 Mass. 539, 404 N.E.2d 1219.

The effectiveness of regulatory legislation depends on the ability of the officials responsible for enforcing it to obtain information. (See generally 1 K. Davis, Administrative Law §§ 3.01 through 3.03 (1958).) In the case of the Consumer Fraud and Deceptive Business Practices Act, the Attorney General's ability to investigate potential violations, without waiting for a consumer to be injured, promotes the Act's remedial aims. As the Supreme Court observed in *Morton Salt*:

> "Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." (338 U.S. 632, 652, 94 L. Ed. 401, 416, 70 S. Ct. 357, 369.)

The Attorney General's investigative powers are not unrestricted. (*People v. Crawford Distributing Co.* (1972), 53 Ill. 2d 332, 344-45.) "But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant." (*United States v. Morton Salt Co.* (1949), 338 U.S. 632, 652, 94 L. Ed. 401, 416, 70 S. Ct. 357, 369.) We therefore hold that the grant of investigative powers to the Attorney General under the Act does not violate the fourth amendment of the United States Constitution or article I, section 6,

---

[3] The cases assimilate the "true" administrative investigation, by a regulatory agency, to investigations by grand juries and legislative commissions. (*People v. Allen* (1951), 410 Ill. 508; see *Hannah v. Larche* (1960, 363 U.S. 420, 4 L. Ed. 2d 1307, 80 S. Ct. 1502.) An investigation by the Attorney General, carrying out his enforcement responsibilities under the Act, is indistinguishable. See *People ex rel. MacFarlane v. American Banco Corp.* (1977), 194 Colo. 32, 37-38, 570 P.2d 825, 829.

of the Illinois Constitution.

Nor do we believe that the investigation undertaken in this case violated the Association's constitutional rights. Our decisions recognize that an administrative subpoena may be so unreasonable in its demands, or so indefinite and general in its terms, as to go beyond the statutory purpose for which the inquiry was authorized and amount to a "constructive search."[4] (*People v. Allen* (1951), 410 Ill. 508, 512-13; *People ex rel. Legislative Com. On Low Income Housing v. Keefe* (1967), 36 Ill. 2d 460, 465; *People v. Lurie* (1968), 39 Ill. 2d 331.) In such a case, the circuit court is not without power to modify a subpoena. (*People v. Allen* (1952), 410 Ill. 508, 510; *United States v. Powell* (1964), 379 U.S. 48, 58, 13 L. Ed. 2d 112, 120, 85 S. Ct. 248, 255.) In testing the validity of an administrative subpoena, the appropriate considerations are: (1) the constitutionality of the statute, (2) whether the contemplated agency proceedings are included within the statutory authority, (3) the reasonableness of the demand, and (4) the relevance of the information sought. (*Illinois Crime Investigating Com. v. Buccieri* (1967), 36 Ill. 2d 556, 562.) We have determined that the subpoena and requirement to file in this case were reasonably definite, and that the information requested was reasonably related to the determination whether violations of section 2 of the Act might have occurred.

The permissible scope of an administrative subpoena, and of any administrative demand for information or the production of documents, is measured by the relevance of

---

[4] A "constructive search" obviously differs from an actual search and seizure in that no physical entry onto premises or seizure of property occurs. (See *Oklahoma Press Publishing Co. v. Walling* (1946), 327 U.S. 186, 195, 202-08, 90 L. Ed. 614, 622, 625-29, 66 S. Ct. 494, 502-05.)) It is mainly for this reason that the warrantless-search cases cited by the Association are inapplicable. (*E.g., Marshall v. Barlow's, Inc.* (1978), 436 U.S. 307, 56 L. Ed. 2d 305, 98 S. Ct. 1816; *Delaware v. Prouse* (1979), 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391.) In further distinction to these cases, we note that there can be no compelled production of documents under the Act until a court has become involved.

the information sought to the problem under investigation. (*People v. Allen* (1951), 410 Ill. 508, 516-17.) In the case of an administrative investigation authorized by statute, relevance must be measured with reference to the statutory purpose, which defines the problem to be investigated. Here, the Attorney General's subpoena stated that it sought information concerning "business transactions with consumers of Illinois, since September 24, 1976 concerning ACHI series of childbirth classes in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act." It listed 13 documents, copies of which were to be produced within 12 days from the date of service (for example: list of parents in Illinois who have taken, are taking, or have agreed to take the series of childbirth classes; copies of all contracts, agreements and papers signed by these parents; copies of all press releases issued by the Association in Illinois; copies of all advertisements, brochures, documents and other papers provided to persons taking the classes; a copy of the ACHI Leader Pack, a 2504-page compilation of medical journal articles; a copy of the Association's articles of incorporation; any documents showing whether the Association is a nonprofit corporation). The requirement to file, served together with the subpoena, asked the Association to prepare within 10 days a verified statement responding to 58 specific inquiries (for example: the names and addresses of present and past officers, directors and employees; the Association's places of business in Illinois; the qualifications and training of Certified Childbirth Educators; the Association's methods of soliciting parents to take its childbirth classes; whether the Association or its employees carry insurance to cover potential liabilities arising from its activities; whether any Certified Childbirth Educator has ever been present or assisted at or performed medical procedures during a home childbirth).

Without detailing all of the information sought by the subpoena and requirement to file, we think that it was

reasonably related to the inquiry into the nature of the Association's business and its transactions with Illinois consumers, with a view to ascertaining the truthfulness and accuracy of its advertising and the fairness of its dealings with Illinois residents, clearly a subject within the scope of inquiry authorized by the Act. It should be borne in mind that the purpose of such an investigation, like that of the grand jury, is to uncover matters previously unknown to the investigating body which may or may not provide grounds for further action. (*People v. Allen* (1951), 410 Ill. 508, 517.) It cannot know in advance what its investigation may produce; therefore, the most that can be required is that the investigator provide a "reasonably informative description" of what is required. (*People ex rel. Legislative Com. On Low Income Housing v. Keefe* (1967), 36 Ill. 2d 460, 465.) We think the Attorney General has done so here.

The Association has attacked the proposed investigation as unreasonable without really specifying why.[5] It appears to believe that *any* investigation would be unreasonable, on the grounds that this would infringe upon its first amendment rights. Interestingly, the defendants in *Oklahoma Press Publishing*—newspaper publishers—also sought to raise the first amendment as a complete bar to investigation. The Supreme Court found, as we do, that the investigation posed no threat to protected expression. (*Oklahoma Press Publishing Co. v. Walling* (1946), 327 U.S. 186, 192-93, 90 L. Ed. 614, 620-21, 66 S. Ct. 494, 497.) We also fail to see any potential infringement of associational freedom. *NAACP v. Alabama ex. rel. Patterson* (1958), 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163, is inapposite.

---

[5] The Association might have had a justifiable complaint that requiring response within 10 days was unreasonable, considering the volume of information requested. In this case the proper course was for it to seek a modification or an extension of time from the Attorney General. (*United States v. Morton Salt Co.* (1950), 338 U.S. 632, 94 L. Ed. 401, 416, 70 S. Ct. 357, 369.) It could also have asked the circuit court, in the enforcement proceeding, for a modification.

The Association argues that the assistant Attorney General was without authority to issue the subpoena and requirement to file, since the Act does not expressly authorize the Attorney General to delegate his investigative powers to assistants. We think that the appellate court correctly disposed of this contention and believe there is little to be added to its analysis. (85 Ill. App. 3d 311, 314-15.) In *Fleming v. Mohawk Wrecking & Lumber Co.* (1947), 331 U.S. 111, 12123, 91 L. Ed. 1375, 1384-85, 67 S. Ct. 1129, 113435, the United States Supreme Court held that the subdelegation, by the Administrator of Emergency Price Controls, of his power to issue administrative subpoenas was proper, even in the absence of express statutory authorization to do so. Where a statute vests power in a single executive head, but is silent on the question of subdelegation, the clear majority view is that the legislature, "understanding the impossibility of personal performance, impliedly authorized the delegation of authority to subordinates." (1 A. Sutherland, Statutory Construction 436.14 (4th ed. 1972).) The subpoena and requirement were properly signed by the assistant Attorney General.

Administrative investigations, like other administrative proceedings, are subject to due process constraints. Not all the procedures traditionally associated with due process in judicial proceedings are required (nor are they appropriate) in administrative proceedings. (*Hannah v. Larche* (1960), 363 U.S. 420, 4 L. Ed. 2d 1307, 80 S. Ct. 1502.) However, an investigation that is arbitrary or in excess of statutory authority or undertaken for an improper purpose, such as to harass, violates due process. (*United States v. Powell* (1964), 379 U.S. 48, 58, 13 L. Ed. 2d 112, 119-20, 85 S. Ct. 248, 255.) We note that the exercise of the Attorney General's investigative powers under the Act is subject to judicial supervision. The Attorney General has no power of his own to *compel* either the filing of reports or the production of documents. If voluntary compliance is refused, he must resort to a court

for an order enforcing compliance. (Ill. Rev. Stat. 1977, ch. 121½, pars. 266, 267.) The safeguard against abuse or excessive zeal that is satisfied, in the case of actual search or seizure, by the warrant and probable cause requirements is provided in the case of an administrative investigation by judicial review in the enforcement proceeding. *Oklahoma Press Publishing Co. v. Walling* (1946), 327 U.S. 186, 217, 90 L. Ed. 614, 634, 66 S. Ct. 494, 510.

For the foregoing reasons, the judgment of the appellate court is reversed in part and affirmed in part. The judgment of the circuit court is reversed and the cause is remanded to that court for further proceedings consistent with this opinion.

*Appellate court affirmed in*
*part and reversed in part;*
*circuit court reversed;*
*cause remanded.*