SHELBY MUDD, Plaintiff-Appellant, v. THE DEPARTMENT OF CHIL-
DREN AND FAMILY SERVICES *et al.*, Defendants-Appellees.

Fourth District No. 4—95—0505

Argued April 17, 1996.—Opinion filed May 31, 1996.

Carl R. Draper (argued), of Feldman & Wasser, of Springfield, for appellant.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Jerald S. Post (argued), Assistant Attorney General, of counsel), for appellees.

JUSTICE GREEN delivered the opinion of the court:
Plaintiff Shelby Mudd appeals a judgment of the circuit court of

Sangamon County entered on March 28, 1995, affirming a January 19, 1994, final administrative decision of the Illinois Civil Service Commission (Commission). That decision upheld the September 1, 1993, discharge of plaintiff from her position of child welfare supervisor with the Illinois Department of Children and Family Services (DCFS). The Commission adopted a hearing officer's report which found that several of the charges against plaintiff had been proved and recommended that these findings were enough to require dismissal. Plaintiff has appealed. We affirm.

Plaintiff maintains that (1) the decision of the Commission was contrary to the manifest weight of the evidence; (2) the charged failures of the plaintiff which the Commission found to have been proved did not constitute grounds for discharge; and (3) the Commission erred in precluding plaintiff from presenting defenses. Defendants assert that we should remand the cause to the circuit court with directions to dismiss the administrative review on grounds that court lacked jurisdiction because plaintiff failed to join all necessary parties in seeking judicial review in that court. We also disagree with that contention.

Section 3—107(a) of the Code of Civil Procedure (Code) states:

"Except as provided in subsection (b), in any action to review any final decision of an administrative agency, the administrative agency and all persons, other than the plaintiff, who were *named by the administrative agency in its final order as parties of record* to the proceedings before the administrative agency shall be made defendants." (Emphasis added.) 735 ILCS 5/3—107(a) (West 1994).

Defendants argue that the Director of Central Management Services, State of Illinois (CMS), was a necessary party under section 3—107(a) of the Code because the final order of the Commission stated that order was "certified to [him]" for enforcement and also stated he had approved the charges for dismissal.

In *Lockett v. Chicago Police Board*, 133 Ill. 2d 349, 354, 549 N.E.2d 1266, 1268 (1990), the supreme court said that the joinder requirement of section 3—107 of the Code is "mandatory." However, the *Lockett* court did not say that the joinder was a jurisdictional requirement. In *McGaughy v. Illinois Human Rights Comm'n*, 165 Ill. 2d 1, 12-13, 649 N.E.2d 404, 410 (1995), the supreme court explained that although the joinder requirement was mandatory, it was not jurisdictional. The supreme court approved the decision of this court in *Board of Education of Bethany Community School District No. 301 v. Regional Board of School Trustees of Clark, Coles, Cumberland, Edgar, Moultrie & Shelby Counties*, 255 Ill. App. 3d 763, 765-66, 627 N.E.2d 1175, 1177 (1994), which had reached the same result.

■ As the question of lack of joinder was not raised before the circuit court and does not involve jurisdiction, it was waived. We need not determine whether the reference to the Director of CMS in the final order made him a necessary party to the judicial review of the administrative decision in the circuit court.

The underlying facts in this case are largely undisputed. At times pertinent plaintiff was employed by DCFS and was the immediate supervisor of child protective investigator Frank Myers. On April 16, 1993, Myers was assigned to investigate the "hot line" report of child abuse to two-year-old M.C. which allegedly had caused a broken arm. M.C. was then living with his mother and her male friend, Keith Bennett. At that time, Myers and plaintiff knew that approximately two years earlier, Bennett had been living with M.C.'s aunt, Laurie Whewell, and her three-month-old child, B.W., when that child died of cranial cerebral blunt trauma. They also knew that a medical examiner had ruled the death resulted from homicide. In addition, they knew that although Bennett had not been prosecuted, many people believed Bennett had killed the child.

The undisputed evidence indicated that Myers began his investigation pursuant to the April 16, 1993, "hot line" call within two hours of receiving the call. He went from his office at Jerseyville to Roodhouse where M.C., his mother, and Bennett lived. He met and talked with M.C., his mother, and Bennett at the Roodhouse police station. Myers testified Bennett told him that earlier M.C. had fallen off a bed but appeared to be all right, but the next day M.C. had fallen from a 15-inch-high stool and appeared hurt. Apparently M.C. was first taken to Boyd Hospital at Carrollton and then to the larger Passavant Hospital in Jacksonville. There, Dr. Harvey Scott, an orthopedic surgeon, reduced the child's fracture and applied a cast on his arm from the wrist to the elbow. The child was held overnight and released.

Myers testified that after two months of investigation, he determined that the incident whereby M.C. broke his arm was "unfounded," meaning that he could not find credible evidence that abuse occurred in the breaking of M.C.'s arm. On June 11, 1993, Myers turned in a report to plaintiff of his investigation. Both Myers and plaintiff testified they had also consulted during the investigation. Plaintiff signed the report, indicating she had read and approved it. In the jargon of DCFS, she "signed off" on the report.

Sometime in the early summer of 1993, M.C., his mother, and Bennett moved from Roodhouse into the Madison-St. Clair County area and were rendered services by the DCFS staff out of an office in Alton. On August 15, 1993, M.C. was found dead. Charges were

brought against Bennett. After an investigation by the DCFS staff, Myers and plaintiff were discharged. The charges listed various failures of Myers and charged plaintiff, in failing to carry out her supervisory duties, was "derelict" in her responsibility in receiving, approving, and "signing off" on Myers' report.

■ Judicial review of an administrative decision concerning discharge of an employee subject to civil service protection is a two-step process. The first decision is whether the factual findings by the administrative agency are contrary to the manifest weight of the evidence. The second is "to determine if the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist," which depends upon whether the decision to discharge "is arbitrary, unreasonable, or unrelated to the requirements of service." *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 551-52, 426 N.E.2d 885, 887 (1981); see also *Launius v. Board of Fire & Police Commissioners*, 151 Ill. 2d 419, 427, 603 N.E.2d 477, 481 (1992).

We first examine the findings of the Commission to determine whether they are contrary to the manifest weight of the evidence. The Commission found that four of the seven charges had been proved. We choose to comment first about a charge which the hearing officer found not to have been proved in regard to either Myers or plaintiff. That charge was that they "failed to recognize the propensity" of Bennett for violence. In finding that not proved, the officer stated that both of them "kept the [B.W.] case in the proper perspective." As we will explain, this finding should not be taken to mean more than that the finding indicated they understood the likelihood that Bennett was very dangerous.

■ The first finding against plaintiff was that (1) she was derelict in approving Myers' report when he had failed to check with the doctors and nurses who had treated M.C., and (2) no records had been obtained from Boyd Hospital in Carrollton. Myers admitted that he had not tried to talk to Dr. Scott or the other doctors who treated M.C. for his broken arm. Undoubtedly hospital and nursing personnel gave Myers a difficult time in attempting to get information, but he only succeeded in obtaining one sheet of information from Dr. Scott's office and one sheet from Passavant Hospital.

The second finding against Myers and plaintiff was that they did not give sufficient importance to the fact that M.C. had received a fracture of the humerus bone of his arm, particularly in view of the fact that the stool upon which he was allegedly sitting was only 15 inches high. This ties into the first finding against Myers and plaintiff. An official of DCFS testified that the rules of that agency

did not necessarily require an investigation to interview each physician who has treated a child suspected to be abused. Ordinarily, the fact that a child falls from a low stool and receives a fractured humerus bone would not create great suspicion or require an extra effort in investigating. However, here both Myers and plaintiff were found to have understood that Bennett was likely dangerous from the circumstances surrounding the death of B.W.

A two-year-old child with a fractured humerus which was caused by a fall from a stool of 15 inches in height takes on an entirely different status when that occurs in the presence of a person known to likely be very dangerous. The Commission could have concluded that under those circumstances a very aggressive and energetic investigation was required, one where many people would be talked to even though they would ordinarily not have been interviewed. Such an investigation would be one where any subsequent injury to a child in Bennett's presence would be considered highly suspicious and not to be handled in the usual manner. The Commission could have determined that Myers did not make that type of investigation, and plaintiff did not require it, and she approved a report that did not include such an investigation.

The third charge found by the Commission to be proved concerned Kay Jones, M.C.'s maternal grandmother. She made one of the April 16, 1993, "hot line" phone calls concerning M.C.'s fractured arm. On April 21, 1993, Myers phoned her and in the course of the phone call she told Myers that Bennett had sexually molested M.C. The Commission found that Myers had failed to properly investigate that contention, and plaintiff had approved that conduct. Myers' report indicated he did not investigate that claim of Jones because she told him that she did not have firsthand information but had heard it from others. Here again the failure to investigate hearsay further might normally be acceptable, but the Commission could conclude that under the instant compelling circumstances the failure of Myers to contact the persons who gave information to Jones, and plaintiff's approval of not doing so, was very negligent.

Much the same can be said of the fourth charge deemed proved. Katherine Plackett, M.C.'s great-grandmother, was the other "hot line" caller on April 16, 1993. On June 7, 1993, Myers went to Roodhouse to talk to various people. Accompanied by the Roodhouse chief of police, Myers went to Plackett's house and found her on her front sidewalk accompanied by three of her sons. According to Myers, Plackett and her sons were very hostile and so they left without getting any information from her. According to Myers, as he was returning to the police station, he got word from one of Plackett's sons that

she was then willing to talk to Myers, and Myers admitted that he did not go back to find out what she would have to say. The Commission found that Myers should have gone back and attempted to get information from Plackett, and plaintiff should have required him to do so and not approved his report in this respect. Plackett could well have had some helpful information for Myers. This was another example of a failure to give the investigation of M.C.'s circumstances the special push it deserved.

Some evidence, which the Commission could have believed, indicated that plaintiff gave only summary consideration of Myers' report. Dana Stevens, a person high in the supervision chain of DCFS, testified that in the investigation after M.C.'s death, he discussed Myers' report with plaintiff and plaintiff, apparently forgetting she had signed the report, said she would never have signed such a report. The report was sketchy and did indicate a lack of follow-through on Myers' part in regard to the charges found proved by the Commission.

Dr. Scott and Dr. Jude Castleton, who treated M.C. at the Carrollton Hospital, testified before the Commission. Neither stated much that would have indicated that M.C.'s arm injury appeared to be the result of abuse. Dr. Castleton did say that, if he had known abuse was suspected because of a male who may have killed another child being present in the household, he would have been more "detailed." The issue here is whether Myers and plaintiff performed properly under the compelling circumstances and not whether their mistakes in investigation and supervision were a proximate cause of M.C.'s death.

One item of information obtained for the first time at the Commission hearing that would have aided Myers and plaintiff in establishing a case to remove M.C. from living in a household with Bennett was a record from Passavant Hospital stating that when M.C. was admitted he had (1) a floor burn on the tip of his nose, (2) edema on the left side of his forehead, (3) a scratch and rash on his scrotum, (4) two bites on his upper thighs, and (5) old bruises on his right lateral thigh.

■ Thus, the evidence before the Commission supports a finding by the Commission that plaintiff's performance was deficient in the manner found by the Commission. A different conclusion is not clearly evident. Plaintiff points out that an administrative rule implementing statutory provisions in regard to State employees provides for progressive discipline to be applied in most cases of poor performance. That rule states as follows:

"Unless grounds clearly are present warranting immediate dis-

charge or suspension pending decision on discharge, employees shall be subject to corrective discipline progressively utilizing counseling, warnings, and/or suspension, as the facts and circumstances dictate, prior to discharge. If an employee's work or work-related conduct remains unacceptable after the application of progressive corrective discipline, such employee may be discharged in accordance with the appropriate rules." 80 Ill. Adm. Code § 302.626 (1994).

We recognize that plaintiff had a large caseload and had many years of prior good service. However, because of the great danger that was involved here, we will not overturn the decision of the Commission, inherent in its ruling, that the failure of plaintiff presents grounds "warranting immediate discharge," and no progressive discipline need be applied. Such a decision is neither arbitrary nor unreasonable. Such a decision is also clearly related to the requirements of the service as it weeds out persons who have made bad mistakes and alerts others to avoid such mistakes.

Finally, we come to the question of whether plaintiff was denied the right to put on a defense. She refers to (1) the action of the Commission in quashing a subpoena for DCFS Director Sterling Ryder, and (2) a refusal to consider the testimony of caseworker Jim Searcy.

■ In support of her request to subpoena Director Ryder, plaintiff produced evidence that Ryder had made a public statement stating that "any child's death is tragic, but to lose [M.C.] under these circumstances is particularly disturbing ***. While we can't undo this tragedy, we hope to send a message throughout this agency that employees will be held accountable for their actions."

The Supreme Court of Illinois has stated:

"In testing the validity of an administrative subpoena, the appropriate considerations are: (1) the constitutionality of the statute, (2) whether the contemplated agency proceedings are included within the statutory authority, (3) the reasonableness of the demand, and (4) the relevance of the information sought." *Scott v. Ass'n for Child Birth at Home, International*, 88 Ill. 2d 279, 296, 430 N.E.2d 1012, 1021 (1981).

The incentive that a department has to create a "scapegoat" for a tragedy such as that here is obvious, and we have taken that into consideration in reaching our decision. Nothing in the statement attributed to Director Ryder indicates any prejudice. If subpoenaing of this Director is to be allowed here, it will have to be allowed in the discharge of many other line employees. We thus conclude that the reasonableness of the subpoena does not meet the standard required by *Ass'n for Child Birth at Home*, when there is little indication of highly relevant testimony.

■ The record indicates Searcy was a caseworker working with M.C. and his mother from the Alton office after they left Greene County. Plaintiff, however, was a supervisor. This would tend to negate the use of any failure of performance by Searcy to prove that grossly uneven discipline was imposed by DCFS as to plaintiff. However, the apparent reason plaintiff wished to present Searcy's testimony was to show some sort of conspiracy within DCFS to merely punish Myers and plaintiff and not other people equally or more at fault. No sufficient showing of relevance or materiality has been presented to us for us to fault the Commission acting through the hearing officer for excluding the offered testimony.

For the foregoing reasons, we affirm.

Affirmed.

STEIGMANN and GARMAN, JJ., concur.